**UNITED STATES PIPE AND FOUNDRY COMPANY, Plaintiff,**

v.

**WOODWARD IRON COMPANY, Defendant.**

Civ. A. No. 1113.

United States District Court
W. D. Virginia,
Roanoke Division.

Oct. 18, 1965.

Frank W. Rogers, Sr., Woods, Rogers, Muse, Walker & Thornton, Roanoke, Va., Hugh P. Carter, Jennings, Carter &

Thompson, Peyton N. Finch, Jr., Birmingham, Ala., for U. S. Pipe and Foundry Co.

Edward S. Graves, Edmunds, Baldwin & Graves, Lynchburg, Va., John Gibson Semmes, Washington, D. C., for Woodward Iron Co.

DALTON, Chief Judge.

This is an action for infringement of United States Letters Patent 2,953,398, issued September 20, 1960, to United States Pipe and Foundry Company, as assignee of the inventors, Lawrence T. Haugen and Carl A. Henrikson, for a pipe joint to be used primarily in the joining of cast iron pressure pipe. The action was originally brought against Lynchburg Foundry Company, but later Woodward Iron Company purchased substantially all the assets and assumed the obligations of Lynchburg Foundry Company, and the Court thereupon entered an order changing the style of the case, making Woodward Iron Company the real defendant, and making all judgments binding on that company. The plaintiff will be hereinafter referred to as U. S. Pipe and the defendant as Lynchburg, as was done by the Master in his first report.

By an order entered June 8, 1961, this cause was referrred to a Special Master for findings of fact and conclusions of law.

 The Court will note at this time that great deference must be accorded the findings of the Master since they turn in large measure on the credibility of witnesses who have presented long, involved, and often conflicting testimony. United States v. Twin City Power Co., 248 F.2d 108 (4th Cir. 1957). His conclusions must therefore be accepted unless they are clearly erroneous. Fed.R. Civ.P. 53(e) (2); London v. Troitino Bros., Inc., 301 F.2d 116 (4th Cir. 1962); Esdale v. Edwards, 28 F.R.D. 390 (W.D. N.C.1961).

The Master has stated the background facts of this case very well, and the Court will quote verbatim from his original report of October 10, 1962:

Lynchburg, at its plant in Radford, Virginia, within this district, manufactures cast iron pressure pipe with a so-called Bell-Tite joint, under license from James B. Clow and Sons, Inc., hereinafter referred to as Clow. Prior to the filing of this action by U. S. Pipe, Lynchburg manufactured pipe with a so-called ledge-type Bell-Tite joint which they have now changed to a so-called ledgeless Bell-Tite joint. U. S. Pipe contends that Claims 1, 5, and 7 of the patent in suit are infringed literally by the ledge-type Bell-Tite joint of all sizes; that Claims 2, 4 and 8 are infringed literally by the ledge-type Bell-Tite joint in sizes above 12 inches; that Claims 5 and 7 are infringed literally by the ledgeless Bell-Tite joint of all sizes; and that Claim 8 is infringed by the ledgeless Bell-Tite joint in sizes above 12 inches.

Lynchburg denies any infringement and asserts that the patent in suit is invalid on various grounds which we will consider later.

The patent in suit is primarily useful as a joint for "as cast" cast iron pressure pipe. Both U. S. Pipe and Lynchburg are major producers of cast iron pressure pipe which is used for the transmission of water and natural gas under pressure. It is competitive with asbestos cement pipe, reinforced concrete pipe, steel pipe and plastic pipe.

Due to the manufacturing process, the actual size of a section of cast iron pressure pipe varies within certain tolerances and it is desirable for a joint to tolerate the extremes in sizes forming a seal under all conditions without machining.

The oldest form of joint for cast iron pressure pipe was made by threading the pipe on each end and screwing on a flange. A full face gasket was placed between the flanges and the flanges bolted together to form the joint. This joint made a good seal at all operating

pressures and was obviously resistant to separation. The assembled joints would not deflect. The pipe required machining and was usually assembled by skilled labor.

From about 1800 to the present time the bell and spigot joint has been in general use. In this form the pipe is cast with one end plain, called the spigot, and with a bell or enlarged portion on the opposite end forming a socket which will accept the entry of a spigot. After the spigot is inserted into the socket of the bell, jute is caulked in the bottom of the socket and molten lead is then poured into the socket with the use of certain accessories to hold the lead in place until it hardens. When the lead has cooled to a certain point, it is also caulked. The caulking is done either with a caulking iron and a hammer or with a pneumatic iron. This joint will operate under medium high pressure and has a life equal to the life of the pipe. If the pipe is deflected, the joint may leak. Its resistance to separation is only fair. No machining of the pipe is necessary and it may be put together by semi-skilled to skilled labor.

The mechanical joint is a form of bell and spigot construction wherein a flange is cast on the end of the bell. A gland is bolted to the flange holding a gasket against the spigot to effect a seal. This joint forms a good seal for all operating pressures and allows some deflection without damaging the seal. The bolts holding the gland corrode more rapidly underground than the pipe and there is poor resistance to separation. No machining is required to meet the tolerances, but the bolt holes must be cored or drilled in the flange.

The roll-on joint is a bell and spigot joint wherein a gasket, circular in cross section, commonly called an O-ring, is placed on the end of the spigot and as the spigot is inserted in the bell socket it rolls to the proper assembly point. A piece of braided jute is then caulked into the socket and a black bitumastic compound is put into the socket to protect the jute. This joint is useful for moderate operating pressures and has a life equal to the life of the pipe. It will permit some deflection, but it has poor resistance to separation. The joint is adequate as cast in sizes up to 16 inches.

Each of the aforementioned types of pipe and joint are open to unrestricted manufacture by anyone in the pipe industry and all manufactureres manufacture each of them with the possible exception of the roll-on joint. Each joint is satisfactory for normal service when properly assembled, but each has its limitations.

The flange joint is not usually used underground but each of the other three joints is used underground and must be put together in an open trench. A depression is dug in the bottom of the trench for the bell end of each section of pipe. This bell hole provides working room during the assembly of the joint.

Weather and soil conditions impose limitations on usefulness of certain of these joints. The bell and spigot joint cannot be assembled in a wet trench because of the molten lead. The roll-on joint cannot be assembled in a wet trench because the gasket will not roll properly if it is wet.

The assembly of each joint is made with differing accessories and tools. A wrench is needed to assemble the flange joint and the mechanical joint. Assembly of the bell and spigot joint requires a melting pot, a ladle for the lead, a "snake" to hold the lead until it hardens, a caulking iron and a hammer. With the roll-on joint, a cone is needed to get the gasket on the spigot because the inside diameter of the gasket is less than the outside diameter of the pipe. A caulking

iron and hammer are also needed to place the jute in position and a pulling tool is needed to get the spigot into the socket of the last pipe.

Of the types of joint which can be assembled in an open trench, the bell and spigot is the most expensive to assemble. The cost of assembly of the mechanical joint is 25 to 50 per cent of the cost of assembling the bell and spigot. The cost of assembly of the roll-on joint is 30 to 65 per cent of the bell and spigot. The accessories used with the mechanical joint cost 154 to 160 per cent of the cost of the bell and spigot accessories. The cost of accessories used in the roll-on joint are 80 per cent of the cost of the bell and spigot accessories.

None of these joints are entirely satisfactory from the point of view of cost or ease of assembly.

During 1952 U.S. Pipe set up a project for the development of a better pipe joint embodying the principles of the O-ring seal. At that time, Lawrence T. Haugen, one of the inventors, was chief engineer of U. S. Pipe. Carl A. Henrikson was engaged in the project and was later placed in charge of the project. The goal was to develop a push-on joint for use with cast iron pipe which had the following desirable features:

1. Be pressure tight against internal pressure under all service conditions;

2. Be pressure tight against external pressure which may be encountered in service;

3. Be flexible within limits so as not to impart rigidity to pipeline;

4. Have life expectancy under field conditions equal to that of pipe;

5. Be resistant to separation due to internal pressure;

6. Be easy to assemble with simple tools and a minimum amount of relatively unskilled labor;

7. Provide assurance that the gasket remain in proper sealing position during assembly;

8. Be capable of being assembled under adverse conditions such as wet trench, small trench clearance, assembly at an angle, etc.;

9. Be simple in construction and economical to manufacture; and

10. Be suitable for "as cast" pipe over the range of tolerances encountered in pipeshop practices.

Over a period extending into 1956, experiments and tests were carried out with various forms of the gasket and differing shapes of grooves in an effort to accomplish these desired results. As a result of these tests and experiments, Haugen and Henrikson arrived at the joint which is the subject of the patent in suit and is embodied in U. S. Pipe's Tyton joint. Sketches of this joint and the gasket were made on February 21 and February 22, 1956, and a U. S. Pipe record of invention form was completed and dated February 24, 1956. The invention at that time contemplated use of a reinforced gasket or a gasket with two hardnesses of rubber.

The joint which was developed embodied all of the desired qualities except resistance to separation. The Tyton joint is good for all pressures for which cast iron pressure pipe is used; the life of the joint is equal to the life of the pipe; it may be deflected 3 to 5 degrees; no bell hole is required in the trench; it can be assembled under wet trench conditions; assembly requires only a tool for pulling the pipe sections together; assembly can be by unskilled labor at a labor cost of 10 to 20 per cent of the cost for bell and spigot pipe; it is adequate as cast; and it requires only the gasket and lubricant as accessories at a cost of 80 to 81½ per cent of the cost of the bell and spigot accessories.

The plaintiff's Tyton joint was first commercially used in April, 1956, and was offered to the trade in a full range of sizes in November, 1956. It had previously been determined in July, 1956, that an unreinforced gasket of one hardness of rubber could satisfactorily be used in assembling this joint in certain sizes.

On May 28, 1956, an application was filed with the United States Patent Office by U. S. Pipe, assignee of Haugen and Henrikson, with claims defining a pipe joint embodying a gasket of two hardnesses. On April 1, 1957, a separate application for a patent was filed differing only from the original application in that it claimed a gasket of a single hardness. On May 6, 1958, the examiner issued a final rejection of the claims of the original application. Thereupon, the applicant submitted further amended claims some of which were broad enough to include a single hardness gasket. The examiner refused to permit the filing of these amended claims subject to the filing of an appeal and abandonment of the continuation-in-part application by the applicant. The continuation-in-part application was abandoned and notice of appeal filed on August 1, 1958. Thereupon the examiner permitted the amended claims to be filed. On July 10, 1959, the Board of Appeals of the Patent Office unanimously approved eight of the claims of the patent and denied two others. On January 20, 1960, an interference was declared between Claim 35 (now Claim 5) of the Haugen application and Claim 26 of the pending Mathieu application. The interference examiner advised U. S. Pipe that the preliminary statement of Mathieu in the interference set forth Brazilian patent application number 80,940 filed July 25, 1955, and Brazilian patent application number 81,987, filed September 15, 1955, for the purpose of establishing priority. The Mathieu application had been filed in the United States Patent Office on May 25, 1956, three days prior to the filing of the Haugen application on May 28, 1956. During the period in which the interference was pending, Yves Mathieu executed an assignment of his rights as set forth in his United States patent application to Compagnie de Pont-a-Mousson, his employer. Representatives of U. S. Pipe entered into negotiations with representatives of Pont-a-Mousson whereby Pont-a-Mousson agreed to file a disclaimer in the interference proceedings and the representatives of U. S. Pipe agreed to enter into a license agreement for certain technical items. The license agreement was subsequently made a written agreement which made no mention of the proceedings in the patent office or the Mathieu application or applications. The license agreement called for the payment of a minimum of $180,000.00 for the use of the items set forth therein which were not related to the Mathieu pipe joint. U. S. Pipe obtained no rights in the Mathieu application and the only thing solicited and obtained with reference to the Mathieu application was a disclaimer which was filed in the interference proceeding. The Mathieu United States application was later abandoned, but this abandonment was not solicited by U. S. Pipe, nor does it appear to have been necessary insofar as U. S. Pipe was concerned. U. S. Pipe's primary object in these negotiations was to obtain the disclaimer.

Based on the disclaimer priority was awarded to the Haugen and Henrikson application and the patent in suit was issued September 20, 1960.

The evidence is conclusive that the industry was interested in improving its product. The manufacturers had formed a research association

and representatives of U. S. Pipe, Lynchburg and Clow were members of the various technical committees of this association. Charles R. Spencer, Executive Vice-President of Lynchburg, had been president and chairman of the executive committee of the Cast Iron Pipe Research Association. Obviously, some people had been at work in this field since there are over 16,000 patents issued for pipe joints.

There existed a widespread belief in the industry prior to the development of the push-on joint that unconfined rubber would deteriorate rapidly underground. It was thought that the rubber must be protected in some manner such as the jute and bitumastic compound used in the roll-on joint.

In August, 1954, William J. Bevington, an employee of Clow, at the request of his superior, drew a sketch of a pipe joint with many of the elements and characteristics of the push-on joint later developed by Haugen and Henrikson. The sketch was submitted to his superior but nothing further was done by him or his superior.

In April, 1957, Clow offered the Bell-Tite joint to the trade. The Clow Bell-Tite joint was developed in a two month period beginning in December, 1956, by Ralph W. Kurtz, operating under the directions of Thomas A. Ripley, Vice President in charge of manufacturing. Kurtz was familiar with the Tyton joint when he began his work. It was their belief that there should be a large cross-section of rubber in the gasket due to the tolerances in "as cast" cast iron pressure pipe. They also thought that the rubber should be relatively hard to hamper tearing or marring during assembly under field conditions. The joint as originally conceived contained a gasket of uniform deformability and was without the ledge. The ledge was added by Ripley when a four-inch section with a ledgeless Bell-Tite joint failed to pass an offset test. The reason for failure was later determined to be an incorrect cross-section gasket, but at the time Ripley believed he had solved the problem by adding the ledge. This ledge was then placed in all of the Bell-Tite joints by Clow.

Lynchburg was first made aware of the Tyton joint in May, 1956, at the meeting of the American Water Works Association. During March, 1957, Lynchburg contacted both U. S. Pipe and Clow with regard to license agreements for their respective pipe joints and requested information regarding tolerances including detailed drawings with critical dimensions. Lynchburg obtained a brochure and an underwriter's report on the Tyton joint, and detailed drawings on the Bell-Tite joint. All of these items were turned over to the engineering department of Lynchburg with a request for a recommendation. Charles R. Spencer, Executive Vice President, considered the recommendations of the Lynchburg engineering department and made the decision to adopt the ledge Bell-Tite joint. The ledge type Bell-Tite joint was manufactured by Lynchburg Foundry Company until its discontinuance on December 6, 1960. Lynchburg began the manufacture of ledgeless Bell-Tite joints in November, 1960, which they have continued. An integral part of these joints is a rubber gasket which is of one hardness of rubber for sizes 12 inches and under and of two hardnesses for sizes of over 12 inches.

The Tyton joint of U. S. Pipe having been first revealed to the public in May, 1956, at the American Water Works Association Convention was put on the market in the full range of sizes in November, 1956. It met with immediate commercial success. In 1957 the Tyton joint accounted for 33.7 per cent of the cast

iron pressure pipe shipments of U. S. Pipe and during the first four months of 1961 it accounted for 71.1 per cent of such shipments. Mechanical joints for the period beginning 1956 had fallen from 58.9 per cent to 20.1 per cent. Bell and spigot joints for the same period had fallen from 31.2 per cent to 8.0 per cent and all others had fallen from 7.9 per cent to .8 per cent. The experience for the entire industry was similar with anticipated sales of cast iron water pipe for 1961 expected to be approximately 63 per cent slip-on (push-on), 33 per cent mechanical and 4 per cent bell and spigot. During the period from 1956 to November 1, 1961, U. S. Pipe sold 63,500,000 feet of pipe using the Tyton joint, or somewhat over 12,000 miles of pipe, or about 3½ million joints. All of the manufacturers of cast iron pressure pipe now manufacture a push-on joint. None of the other manufacturers were producing a push-on joint in November, 1956. Patent applications have been filed in 35 foreign countries on the Haugen pipe joint and 28 patents have been issued. License agreements have been entered into between U. S. Pipe and a number of domestic and foreign manufacturers of cast iron pressure pipe for use of the Haugen joint from which U. S. Pipe has, through the first three quarters of 1961, received royalties in excess of $415,-000.00.

Through the first half of 1961 the Bell-Tite joint constituted 58.6 per cent of Lynchburg's production. The mechanical joint constituted 37.4 per cent and the bell and spigot constituted 4 per cent of such production. Mechanical joint had fallen from a high of approximately 82 per cent of Lynchburg production in 1956 and 1957 following the introduction of the Bell-Tite joint. The commercial success of the push-on joint has been universal. It has substantially displaced the production of all other joints with the exception of the mechanical which has been reduced substantially. This success is not without significance.

■ The Master notes that consideration of the validity of a patent begins with 35 U.S.C. § 282 (1958), which states: "A patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it." He further states that where there has been a heated contest in the Patent Office, as here, (the Haugen-Henrikson application was considered and rejected by the Patent Office examiner four times before eight of the claims were finally approved by the Patent Office Board of Appeals) the presumption of validity is strengthened thereby. Modern Products Supply Co. v. Drachenberg, 152 F.2d 203 (6th Cir. 1945).

Of the eight claims of the patent in suit, numbers 1, 2, 4, 5, 7, and 8 are pertinent to this suit. The broadest of these, Claim 5, reads:

5. A pipe joint comprising, in combination an inner pipe section having an end portion of generally cylindrical outer circumference, an outer pipe section having a generally cylindrical inner circumference defining an opening receiving said end portion of said inner pipe section, said outer pipe section having an axially elongated annular groove in its inner wall radially opposite said inner pipe section, said groove being defined on its axial and adjacent the said opening by the internal wall of a lip extending toward the said inner pipe section and being further defined by a substantially axially extending wall portion and on its axial and remote from said opening by a second wall extending toward said inner pipe section, the diameter of the said lip at its inner extremity being slightly greater than the external diameter of said inner pipe section, an annu-

lar space on the axial side of said groove remote from said lip into which said inner pipe section projects, said space having a portion with a diameter less than the diameter of the said axially extending wall portion of the groove, an axially elongated annular gasket having two axial parts both of which are fitted in said groove, a first axial part of said gasket having at least a portion thereof in engagement with the axially extending wall of said groove and the outer wall of said inner pipe section under radial compressive force whereby a seal is effected between said outer and said inner pipe sections, the other axial part of said gasket being positioned axially adjacent said opening and having an inside diameter tapering inwardly from a maximum greater than the outside diameter of said inner pipe section, and means cooperating between said other axial part and an adjacent wall of said groove for securing said gasket against axial movement of translation relative to said groove during assembly of said joint.

The parties agree that if this claim is valid, all the other claims in suit are also valid. (The Master summarizes the other claims on pages 18 and 19 of his first report.)

Lynchburg asserted that the patent in suit was invalid, contending:

(1) that the patent was anticipated by six named prior patents;

(2) that the differences between the subject matter sought to be patented and the prior art were such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains, citing 35 U.S.C. § 103 (1958);

(3) that the claims of the application of Haugen and Henrikson did not originally disclose a pipe joint having a gasket of uniform deformability, and that the later changing of the wording of certain of the claims to eliminate references to gaskets of dual deformability constituted an injection of new matter into the application in violation of 35 U.S.C. § 132 (1958);

(4) that Mathieu, and not Haugen and Henrikson, was the first inventor of the patented item.

The Master decided each of these contentions adversely to Lynchburg. Specifically, he found:

(a) that anticipation is a technical defense wherein all elements must be found in a prior patent performing the same function. Stauffer v. Slenderella Systems of California, 254 F.2d 127 (9th Cir. 1957). Although the defendant cited anticipating patents, it was not clear whether it was claiming that all the elements of the patent in suit were found in any prior patent, and so the Master examined each of the cited patents, determining that none anticipated the patent in suit;

(b) that the patent in suit is a combination patent and every element comprising it has been previously used in a pipe joint or sealing device, but that the inventor will not be condemned by hindsight. In other words, it is often tempting to look at the invention after the fact and conclude that the improvement is actually quite minor and should have been obvious to anyone—a "why didn't I think of that?" approach. However, the Master noted that men of skill and ability had made numerous efforts over the years to construct improved pipe joints but none had arrived at the combination taught by the Haugen-Henrikson patent. In light of the manifested need for such a joint, it is strange that it was not produced and enjoyed previously if the design was obvious from the prior art;

(c) that the original application couched in phrases describing a gasket with two parts of different hardnesses would necessarily include a gasket of single hardness and therefore the amending of a claim to remove references to two hardnesses of a single gasket whereby the claim would encompass a gasket

with a single hardness is not an injection of new matter into the application;

(d) that the Mathieu joint is of no consequence in determining the validity of the Haugen-Henrikson patent as it has no standing in this country.

■ In order for an accused structure to infringe a combination patent, there must be substantial identity of means, operation and result. 69 C.J.S. Patent § 301. Every essential element must be used in the accused structure to produce substantially the same result as in the infringed structure. Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670 (4th Cir. 1961). Using this criteria, the Master concluded that the defendant had infringed plaintiff's patent and that plaintiff was entitled to an injunction enjoining defendant from further direct or contributory infringement of Claims 1, 2, 4, 5, 7, and 8 of the patent in suit, and an accounting for profits and damages. He also found that the infringement was not willful and recommended that no punitive damages be assessed.

On December 10, 1962, this Court entered an order approving the report of the Special Master as amended. Compensatory damages were left for later decision, while increased damages and attorneys' fees were immediately denied.

■ The case was subsequently appealed to the United States Court of Appeals for the Fourth Circuit. In United States Pipe and Foundry Co. v. Woodward Iron Co., 327 F.2d 242 (4th Cir. 1964), that Court said that it would affirm the decision of the District Court that the patent was valid and infringed if it were persuaded that U. S. Pipe's assignors were the first inventors. The Fourth Circuit noted that in effect the Master had found Haugen and Henrikson to be the first inventors, but the Court was confused as to whether the Master was relying on 35 U.S.C. § 102(f) or § 102(g), or whether he was predicating his conclusions solely on the basis of Mathieu's disclaimer. The disclaimer filed by Mathieu settled the matters in controversy between the parties, but it did not override the public interest in seeing that a patent is granted only to the first inventor, and the decision of this Court was vacated and remanded for the purpose of determining who was the first inventor. The Court of Appeals stated that if Haugen and Henrikson were found to be the first inventors, the original judgment of this Court should be re-entered.

The decision of the Court of Appeals was further clarified by an opinion on a petition for rehearing filed by United States Pipe and Foundry Company v. Woodward Iron Co. which is reported at 329 F.2d 578 (4th Cir. 1964).

By order of this Court dated March 19, 1964, the case was again referred to the Special Master to make a further and supplemental report. Hearings were held before the Master and the Court on April 27 and 28, 1964, and briefs and reply briefs were thereafter submitted by counsel for the plaintiff and counsel for the defendant.

The Court will note at this point the disposition of companion case, styled James B. Clow & Sons, Inc. v. United States Pipe and Foundry Co., by the Court of Appeals for the Fifth Circuit. In that case the District Court for the Northern District of Alabama adjudged the Haugen and Henrikson patent valid and infringed, but made no determination as to who was the first inventor. The Fifth Circuit affirmed in part, and sent the case back to the trial court for a finding on the question of first inventorship. 313 F.2d 46 (5th Cir. 1963). The District Court subsequently determined that Haugen and Henrikson were the first inventors and this decision was affirmed by the Court of Appeals for the Fifth Circuit on July 8, 1965, in 348 F.2d 127.

Although the Fourth Circuit decided that there was not sufficient privity to render the Clow case binding on and dispositive of the present action, the determination of the Fifth Circuit is nonetheless entitled to serious consideration, as

the same patents were involved and, so far as can be determined, substantially the same evidence was presented.

 The Fourth Circuit stated that the question of first inventor appeared to depend on a determination of priority under 35 U.S.C. § 102(g). It was further observed by the Court of Appeals for the Fourth Circuit that priority under § 102(g) will be determined by whether the Mathieu American and Brazilian applications "read on" the Haugen and Henrikson patent. The only issue to be determined by this Court, as we construe the opinion, and as stated by the Master on page 6 of his Supplemental Report, filed June 2, 1965, is:

> " * * * whether the Mathieu Brazilian and American applications, as originally filed, disclose ' * * first axial part of said gasket having at least a portion thereof in engagement with the axially extending wall of said groove and the outer wall of said inner pipe section under radial compressive force whereby a seal is effected between said outer and said inner pipe sections * * *' Counsel concede that this limitation which appears in Claim 5 of the patent in suit must be disclosed by the Mathieu Brazilian and American applications in order for Woodward to prevail in this action."

The Master has determined in his last report that the Mathieu applications, which had been made available for study by the Patent Office, did not disclose a gasket which sealed by radial compressive force and hence Haugen and Henrikson were the first inventors of the patent in suit. As mentioned previously, the Court of Appeals for the Fifth Circuit reached this same conclusion in its decision of July 8, 1965. This Court has carefully reviewed the evidence introduced in this case and has concluded that the report of the Master to the effect that the Mathieu and the Haugen and Henrikson applications do not disclose the same invention is not clearly wrong. It follows therefore that the Master's report should be affirmed.

The Master held that the Mathieu applications disclose a gasket which seals by the "lip seal" principle rather than by radial compressive force. The Brazilian Application Number 80940 of Mathieu, filed July 25, 1955, discloses a "V-lip" type gasket; the Brazilian Application Number 81987 of Mathieu, filed September 15, 1955, discloses a gasket consisting of two elements, the first of which is shaped like a "U" and contains the second element within the U; and the United States Application Number 587365 of Mathieu, filed May 25, 1956, discloses a gasket which incorporates the principles set forth in the two Brazilian Applications (the Fifth Circuit considered only the Brazilian Applications, noting that if they did not disclose the same invention it would be unnecessary to consider the American Application).

All of the above gaskets of Mathieu seal on the principle of the fluid in the pipe pressing the two lips of the gasket apart and into sealing contact with the inner and outer pipe sections. The greater the hydraulic pressure, the greater will be the seal thus effected. It is true that the gasket may be forced to some extent in the insertion process and that its inner lip is in contact with the pipe spigot, and since the inner diameter of this lip is less than the outer diameter of the spigot, the lip will be under tension from the insertion of the spigot. It is a well established principle of physics that for every action there is an equal and opposite reaction, the opposite reaction in this case being a certain amount of compression applied to the spigot from the gasket. However, the seal thus effected is only an *initial seal* (which is always necessary to enable the gasket to accept the subsequent fluid pressure without blowing out of its seating). The actual final and complete seal which is made by this type of gasket is dependent upon the fluid flowing in the pipe. It is true that rubber will not hold a force but must transmit it, but the force in this case, which originates as a result of the insertion of the spigot, is not transmitted to any significant extent to the

outer lip of the gasket which is in contact with the bell, as defendant seems to contend.

On the other hand, the gasket invented by Haugen and Henrikson is based on the "O-ring" principle wherein there is a continuity of rubber, that is, a solid column of compressed rubber between the bell and the spigot. The gasket has a greater radial thickness than the space between the bell and spigot, which enables the spigot to be inserted only through a forced deformation of the gasket, resulting in a seal under radial compression. This is both the initial and final seal, and as far as this Court can determine, fluid pressure has little or no effect as far as improving the seal is concerned. The load on the inner surface of the gasket, which is caused by the insertion of the spigot, is transmitted directly to the outer surface of the gasket which is in contact with the bell. This seal, effected solely by insertion of the spigot, will seal against negative pressure and vacuums.

It might be instructive here to quote a portion of the testimony of Mr. Tracy D. Nathan, a witness for the defendant, which was elicited on cross-examination:

"Q Well, now you, of course, are familiar, Mr. Nathan, with the fact that in the Mathieu Application, he speaks of the gasket in his joint sealing, because the pressure gets in between these lips and pushes them apart.

A Yes, sir.

Q That's true, isn't it?

A Yes, sir.

\* \* \* \* \* \*

Q But in your study of the Mathieu disclosure now, doesn't he teach that he effects the seal in his gasket by reason of the hydraulic pressure getting between those lips and pushing them apart?

A Well, I see what you are talking about, but that is the end point, rather than the start. The start has got to be your radial compression against the sealing surfaces to allow the water to run into the self-energizing pocket, and then as your hydraulic pressure increases, the efficiency of your gasket increases accordingly."

Transcript, Volume II, 241–42 (April 28, 1964).

This is precisely the point that the Court has made with reference to Mathieu's gasket, and it is believed that it points up the basic mistake in all of defendant's contentions on this point. In the case of Mathieu's gasket the sealing operation is a two-step process: the initial seal, which enables the gasket to withstand the oncoming fluid pressure, and the final seal, which is effected by the fluid itself. On the other hand, the Haugen and Henrikson gasket seals in one step: the seal is completely and finally effected by insertion of the spigot and the consequent transmission of the force through the solid column of rubber to the outer surface. There may be compressive force to some extent which holds the Mathieu gasket in its seating, but the *seal of the gasket* is accomplished by fluid pressure.

Mathieu's Brazilian Applications bear out the Court's finding in this respect. In Number 80940 he says, "The completed joint presents the final aspect illustrated in figure 3 which shows that a seal is provided by the pressure of the fluid conveyed itself which acts to force lips (6) and (5) against the pipe walls." In Number 81987 he differentiates between "low pressure" seals (presumably the initial seal) and "high pressure" seals (the final seal). With regard to the latter, he states, "Figure 4 shows that the pressure of the fluid conveyed in the line is always applied to packing ring (1), thereby ensuring high pressure sealing."

This Court has recently been advised that counsel for the appellant have filed a petition for a rehearing of the Clow case, supra, with the Court of Appeals for the Fifth Circuit. In the petition, counsel contend that the Court arbitrarily divided pipe seals into two mutually exclusive classes, O-ring and V-lip, and

thus ignored those gaskets which combine features of both types of gasket. They assert that such a combination is found in Mathieu's Brazilian Application Number 80940, and note in addition that this Court had the benefit of experiments, conducted in court, which employed that type of combination gasket. (Petition for rehearing denied September 13, 1965.) (Petition for certiorari pending in Supreme Court of United States.)

For the record, this Court does not entertain the idea (and it is doubtful that the Fifth Circuit did) that a gasket must be either of the O-ring or V-lip variety. Names have been arbitrarily applied to the various gaskets merely to facilitate communication and obviate the necessity of giving a detailed description of the device each time it is referred to. The conclusions of this Court have been reached by considering how the gaskets function and not what they are called.

■ Defendant has argued at length that the presumption in favor of the validity of a patent does not apply in this situation, and that the burden of proof is on the plaintiff to show that the Mathieu gasket does not seal by radial compressive force. The Court is not certain whether by "burden of proof" defendant means the burden of persuasion or the burden of going forward with the evidence. Suffice it to say, however, that even if we assume, without deciding, that defendant is correct in its assertions, this Court adopts the findings of the Master that the plaintiff has carried the burden. The standard of this burden is the preponderance of the evidence. Evans v. Associated Automatic Sprinkler Co., 241 F. 252 (3d Cir. 1917).

The Court hereby adopts the Master's findings that by a preponderance of the evidence:

(1) the Mathieu Brazilian Application Number 80940 does not disclose the limitation of Claim 5 of the Haugen-Henrikson patent;

(2) the Mathieu Brazilian Application Number 81987 does not disclose the limi-

tation of Claim 5 of the Haugen-Henrikson patent; and

(3) the United States Mathieu Application, Number 587356, as filed, does not disclose the limitation of Claim 5 of the Haugen-Henrikson patent.

■ The Court finds that Haugen and Henrikson are the first inventors of the pipe joint described in Claim 5 of the patent in suit and, based on this and the opinion of the Fourth Circuit in United States Pipe and Foundry Co. v. Woodward Iron Co., supra, the Court finds that the patent in suit was validly issued and infringed by the ledge and ledgeless Bell-Tite joints manufactured by the defendant within this District.

■ Plaintiff is entitled to an injunction enjoining the defendant from further direct or contributory infringement of Claims 1, 2, 4, 5, 7 and 8 of the patent in suit, and an accounting for such sums as may properly be due to plaintiff, but the Court being of the opinion that the infringement was not willful, doth deny increased damages and attorneys' fees.

An order will be entered to this effect.